IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BRANDON P.,                          )
                                     )
                Plaintiff,            )
                                     )
        v.                           )    1:23CV14
                                     )
MARTIN J. O'MALLEY,[1]                )
Commissioner of Social Security,      )
                                     )
                Defendant.            )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Brandon P. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The Parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on July 2, 2020, alleging a disability onset date of December 15, 2019. (Tr. at 16, 205-06.)[2] Plaintiff's application was denied initially (Tr. 84-104, 115-18) and upon reconsideration (Tr. at 105-14, 125-29). Thereafter,

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 130-31.) On July 1, 2022, Plaintiff, along with his attorney, attended the subsequent telephonic hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 16, 40-83.) At that time, Plaintiff amended his alleged onset date to December 15, 2020. (Tr. at 16, 18, 47.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 33), and on November 8, 2022, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets and quotation omitted).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (internal quotation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation omitted). "If there is evidence to justify a refusal to direct a

2

verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 *et seq.*, provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 *et seq.*, provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his amended alleged onset date of December 15, 2020. (Tr. at 18.) The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 18.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> degenerative disc disease of the cervical and lumbar spine, fibromyalgia, asthma, depression, anxiety, and post-traumatic stress disorder (PTSD)[.]

(Tr. at 19.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 19-24.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, during the time period at issue, he could perform a range of light work, defined as follows:

> [Plaintiff] could lift, carry, push, and/or pull twenty (20) pounds occasionally and ten (10) pounds frequently, sit for six (6) hours in an eight-hour workday, and stand and/or walk for six (6) hours in an eight-hour workday. [He] could occasionally climb ladders, ropes, or scaffolds and frequently climb ramps and stairs. [Plaintiff] could occasionally balance, as that term is defined in the DOT, and occasionally stoop, kneel, crouch, and crawl. [He] could frequently reach in all directions. [Plaintiff] could tolerate occasional exposure to pulmonary irritants, including dusts, fumes, odors, gases, and poor ventilation. [He] is limited to understanding, remembering, and carrying out simple instructions, can use judgment to make simple work-related decisions, and could sustain concentration, attention, and pace sufficient to carry out those simple instructions for two-hour intervals over the course of an eight-hour workday. [Plaintiff] is limited to working in a low-stress setting, which is specifically defined to mean: no paced production, such as on an assembly line where the worker does not control the pace of production; only simple work-related decisions; few or no changes in the work setting or routine; no dealing with crisis situations as an essential function of the job; and only superficial contact with the public, where "superficial" is defined to mean the contact is incidental and not an essential function of the job.

(Tr. at 24.) At step four of the analysis, the ALJ found, based on the above RFC and the vocational expert's testimony, that Plaintiff was unable to perform any of his past relevant work. (Tr. at 31-32.) However, the ALJ determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 32-33.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 33.)

Plaintiff now contends that the ALJ erred in two respects when assessing Plaintiff's RFC. First, he argues that the ALJ failed to properly consider the "combined effect" of Plaintiff's marijuana abuse and other medical conditions. (Pl.'s Br. [Doc. #9] at 9.) Second, Plaintiff asserts that the ALJ "erred in failing to define the non-vocationally relevant phrase 'low-stress setting, which is specifically defined to mean: no paced production, such as on an

6

assembly line where the worker does not control the pace of production[.]'" Instead, Plaintiff contends, the ALJ provided "an example rather than a true definition, which is insufficiently clear to permit judicial review of the RFC." (Pl.'s Br. at 15.)

A. Marijuana use

Plaintiff's challenge regarding the effects of his marijuana use relies on 20 C.F.R. § 404.1535 and Social Security Ruling ("SSR") 13-2p, both of which set out the steps an ALJ must take to properly consider the impact of a claimant's marijuana use alongside his other impairments. A claimant cannot be considered disabled for Social Security purposes if alcoholism and/or drug addiction is "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). To determine whether this is the case, the regulations provide as follows:

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
>> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>>
>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535(b). In other words, § 404.1535 describes a two-step process, which has been further clarified in Social Security Ruling 13-2p. Social Security Ruling 13-2p: Titles II

7

and XVI: Evaluating Cases Involving Drug Addiction and Alcoholism (DAA), SSR 13-2p, 78 Fed. Reg. 11939, 2013 WL 603764 (effective March 22, 2013). As part of that two-step process, an ALJ "must *first* make a determination as to disability by following the five-step sequential evaluation process, 'without segregating out any effects that might be due to substance use disorders.'" Piccini v. Comm'r of Soc. Sec., No. 13-cv-3461 (AJN)(SN), 2014 WL 4651911, at *12 (S.D.N.Y. Sept. 17, 2014) (quoting Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003)). If the ALJ finds the claimant disabled based on symptomology alone, she must then follow the five-step sequential analysis a second time to determine "whether the claimant would still be considered disabled if he stopped abusing drugs or alcohol." See Piccini, 2014 WL 4651911, at *12.

In the present case, the ALJ did not include a substance abuse disorder among Plaintiff's severe impairments at step two of the sequential analysis. (Tr. at 19.) However, in assessing Plaintiff's RFC, she found that Plaintiff "reported daily use of marijuana despite advisement to stop." (Tr. at 27.) The ALJ also noted "some inconsistencies between [Plaintiff's] allegations and the evidence of record." (Tr. at 28.) In particular, the ALJ noted that

> [Plaintiff's] treatment for both his physical and mental conditions has been complicated by his failure to disclose his marijuana use to his mental health and pain management providers. Although [Plaintiff] reported during a June 2022 visit to his psychiatrist that he had informed his pain management provider of his marijuana use two (2) months earlier, pain management records do not reflect this as of his last visit in April 2022 (Exhibits 18F/64-69; 24F/3). [Plaintiff] initially admitted to his mental health providers that he was using "large amounts" of CBD products with some THC and then in June 2022 reported reducing his marijuana use to two (2) to three (3) times per week, with the last use on June 3, 2022 (Exhibit 24F/2). He testified that he was getting marijuana from his uncle who has a medical marijuana prescription and that he also was paying for it out of his savings (Exhibits 5F/3; 7F/3-4; 10F/15;

8

Case 1:23-cv-00014-JEP   Document 16   Filed 03/21/24   Page 8 of 15

> 17F/14, 24; 25F/3; Hearing Testimony). However, this is not consistent with [Plaintiff's] report that he did not have the funds to pay for medical treatment at Carolina Pain Institute, nor does it comport with urinalysis screenings that were negative for THC (Exhibits 7F/3, 18F/59). Although it is unclear how much marijuana or THC the claimant was using, any use would have been in direct violation of the recommendations of his mental health providers, who strongly advised against its use due to the interaction with psychotropic medications (Exhibit 24F/2).
>
> The record reflects numerous instances of not disclosing marijuana use to examining and treating sources (Exhibits 5F/3, 7F/3, 17F/11, 24, 32, 18F/67, 21F/2,). Although [Plaintiff's] marijuana use itself may not be a significant issue, it does raise concerns about the accuracy of his other reports. Further, the failure to report such use to mental health and pain management providers calls into question the extent of his symptoms and his commitment to treating his allegedly limiting physical and mental health problems.

(Tr. at 28.)

Plaintiff now argues that "the ALJ's discussion of marijuana use lacks clarity about whether she is evaluating credibility, DAA [drug abuse], symptom severity, compliance with treatment, or all four, rendering unclear the extent to which [Plaintiff's] marijuana use impacted the ALJ's decision." (Pl.'s Br. at 9.) However, the sole matter at issue under both 20 C.F.R. § 404.1535 and SSR 13-2p is whether the ALJ considered the materiality of Plaintiff's substance abuse when assessing his RFC. Here, the ALJ specifically determined that Plaintiff's marijuana use was not, by itself, "a significant issue." (Tr. at 28.) Accordingly, substance abuse did not amount to a severe impairment at step two, nor did it directly impact Plaintiff's RFC. In other words, it was immaterial to the ultimate issue of disability. As such, there was no need for the ALJ to separately determine whether Plaintiff would be disabled absent his substance use.

Moreover, the ALJ clearly explained that the crucial issue surrounding Plaintiff's marijuana use was not the impact of the drug use itself on his functioning, but rather Plaintiff's

9

lack of candor to both the Court and his providers. As specifically noted by the ALJ, Plaintiff's nondisclosure and under-disclosure of his marijuana use throughout the relevant time period calls into question "the accuracy of his other reports." (Tr. at 28.) This is supported by the medical record, reflecting his failure to disclose his marijuana use (Tr. at 448, 456, 486, 1030, 1041, 1049, 1122) and his provider's frustration with his lack of honesty (Tr. at 1019-20, 1028, 1031-32, 1144-45, 1154, 1288.) The ALJ also noted Plaintiff's report that he could not pay for treatment at the Pain Institute, which was "not consistent" with his admission that he was continuing to pay for marijuana. (Tr. at 28.) The ALJ further noted that Plaintiff was failing to follow the recommendation of his treatment providers (Tr. at 28, 1149, 1283), and the ALJ concluded that Plaintiff's failure to report his marijuana use to his medical providers "calls into question the extent of his symptoms and his commitment to treating his [medical conditions]." (Tr. at 28.) The ALJ took Plaintiff's lack of candor into consideration when considering his statements regarding symptoms, and Plaintiff does not directly challenge this determination.[5] In short, the Court finds no basis for remand.

---

[5] The ALJ also considered other evidence in the record regarding Plaintiff's "inconsistencies" and lack of candor, including "symptom exaggeration" on a functional capacity evaluation, specifically:

> the June 15, 2022 functional capacity evaluation completed by Adam Paul Najmulski, PT, in which the claimant failed most of the validity criteria (Exhibit 25F/14-36). While Mr. Najmulski is not an acceptable medical source per Social Security regulations, his findings are persuasive as to the determination of the claimant's effort in the evaluation, which was found to be "very poor or voluntary submaximal," which is not necessarily related to pain, impairment, or disability (Exhibit 25F/15). His explanation of his findings regarding the claimant's effort was detailed and specific. In addition, the undersigned notes that the claimant displayed leg and torso lift capabilities of zero (0) pounds, which is inconsistent with objective examination findings noting 5/5 strength in the upper and lower extremities (Exhibit 5F/5-6). The results of this evaluation suggest the claimant's other subjective reports to treating and examining sources have not been entirely accurate.

(Tr. at 28-29, 31.)

B. <u>Low-stress setting</u>

Plaintiff next contends that the ALJ "erred in failing to define the non-vocationally relevant phrase 'low-stress setting, which is specifically defined to mean: no paced production, such as on an assembly line where the worker does not control the pace of production,' instead giving an example rather than a true definition." (Pl.'s Br. at 15.) He argues that this error renders the RFC "insufficiently clear to permit judicial review of the RFC." (Pl.'s Br. at 15.)

Notably, it is the function of the ALJ to consider the record and articulate the relevant functional limitations in the RFC. The ALJ did so here by concluding that Plaintiff could work in occupations with a low-stress setting, more specifically defined as requiring no paced production work. Indeed, contrary to Plaintiff's assertion, myriad cases in this district have noted that ALJs frequently, and without error or objection, define low stress work as work not requiring fast-paced production or rigid quotas. See, e.g. <u>Sizemore v. Berryhill</u>, 878 F.3d 72, 79 (4th Cir. 2017) (ALJ defined "a low stress work setting" as "non-production jobs without any fast-paced work" (internal brackets omitted)); <u>Green v. Berryhill</u>, No. TMD 15-3467, 2017 WL 1048155, at *8 (D. Md. Mar. 20, 2017) (ALJ included limitation to low-stress work defined as occasional decision-making and no fast-paced production work); <u>Winston v. Colvin</u>, No. 4:13-CV-221-FL, 2015 WL 450835, at *3 (E.D.N.C. Feb. 3, 2015) (ALJ defined a low stress work setting as one that was non-production pace or quota based, with no more than occasional changes in the work setting, and no more than occasional decision-making); <u>Nelson v. Colvin</u>, No. 4:11-03367-TER, 2013 WL 4647531, at *3 (D.S.C. Aug. 29, 2013) (ALJ's RFC finding included a restriction to a low stress environment, which was defined as no fast-paced production or rigid quotas).

Here, the ALJ reasoned that Plaintiff was limited to low stress work as a result of his multiple mental impairments, and then included this limitation in Plaintiff's RFC, further describing such work as including "no paced production, such as on an assembly line where the worker does not control the pace of production." (Tr. at 24.) The ALJ further defined a "low-stress setting" as involving "only simple work-related decisions; few or no changes in the work setting or routine; no dealing with crisis situations as an essential function of the job; and only superficial contact with the public, where 'superficial' is defined to mean the contact is incidental and not an essential function of the job." (Tr. at 24.) The ALJ specifically considered the psychiatric consultative examination, and found that

> in consideration of [Plaintiff's] reported anxiety and panic attacks, he would require a low stress setting with no paced production and only simple work-related decisions, few or no changes in the work setting or routine, and no dealing with crisis situations as an essential function of the job.

(Tr. at 30.) The ALJ also considered and found persuasive the findings of the state agency psychological consultants. Specifically, Dr. Tyrell found that Plaintiff could "interact appropriately in a low-stress work setting with limited public contact, and adapt to routine changes in a work setting." (Tr. at 30, 99.) Dr. Strobel-Nuss found that Plaintiff could "adapt [to] a variety of simple tasks when required to perform them at a non-rapid pace." (Tr. at 30, 112.) The ALJ adopted these limitations in setting the RFC, and concluded that

> the limitations to simple instructions, simple work-related decisions, and low stress work account not only for his mental health symptoms, but also for the effects of chronic pain, including headaches, and side effects of medication.

(Tr. at 31.) Thus, read as a whole, the ALJ's decision clearly accounted for restrictions related to Plaintiff's depression, anxiety, and PTSD by limiting him, in part, to work performed in a low-stress setting.

12

Plaintiff nevertheless contends that the Fourth Circuit's more recent decisions in Thomas v. Berryhill, 916 F.3d 307 (4th Cir. 2019) and Perry v. Berryhill, 765 F. App'x 869 (4th Cir. 2019), have "held [that] phrases such as 'production rate or demand pace' are not vocationally relevant." (Pl.'s Br. at 17) (citing Thomas, 916 F.3d at 312; Perry, 765 F. App'x at 872). In Thomas v. Berryhill, the Fourth Circuit found that an RFC limitation prohibiting work "requiring a production rate or demand pace" did not provide "enough information to understand what those terms mean." Thomas, 916 F.3d at 312. Accordingly, the Fourth Circuit in Thomas held that, "[w]ithout further explanation," it would not determine "whether the RFC finding—particularly the portion restricting Thomas to jobs that do not require a 'production rate' or 'demand pace'—properly account[ed] for Thomas's moderate limitations in concentration, persistence, and pace." Id. at 312 n.5; see also Perry, 765 F. App'x at 873 (finding that the failure to define the term "non-production oriented work setting" precluded meaningful review).

However, the RFC in the present case provides the "further explanation" absent in Thomas, Perry, and their progeny. Specifically, as noted by Defendant, the limitations in the present case align with another Fourth Circuit decision, Sizemore, 878 F.3d at 80-81, in which the Fourth Circuit held that substantial evidence supported a limitation to "low stress non-production jobs with no public contact." In Perry, the Fourth Circuit noted that

> the ALJ in Sizemore provided additional context, explaining that the claimant could perform work only in a 'low stress' setting, without any 'fast-paced work' or 'public contact,' to account for moderate limitations in concentration, persistence and pace. Those descriptors helped to explain the restriction intended by the ALJ, and allowed us to evaluate whether that restriction adequately accounted for the claimant's limitations.

Perry, 765 F. App'x at 872 n.1 (internal citation omitted).

13

Here, as in Sizemore, the ALJ's RFC finding included sufficient additional context to explain the restrictions intended by the ALJ. As discussed above, the ALJ in the present case discussed the limitations based on the specific findings of the consultative psychiatric examiner and the state agency psychiatric consultants, and then provided far more context than the cases cited by Plaintiff, limiting Plaintiff to

> working in a low-stress setting, which is specifically defined to mean: no paced production, such as on an assembly line where the worker does not control the pace of production; only simple work-related decisions; few or no changes in the work setting or routine; no dealing with crisis situations as an essential function of the job; and only superficial contact with the public, where "superficial" is defined to mean the contact is incidental and not an essential function of the job.

(Tr. at 24.) This language tracks the explanation that the ALJ provided to the Vocational Expert at the hearing, in which the ALJ posed a hypothetical in which:

> The individual is limited to working in a low stress setting which is defined to mean no paced production such as on an assembly line where the worker does not control the pace of production, only simple work related decisions, few or no changes in the work setting or routine, no dealing with crisis situations as an essential function of the job and only superficial [contact] with the [public] where superficial is defined to mean the contact is incidental and not an essential function of the job.

(Tr. at 79-80.) In short, the ALJ did not use "paced production," in isolation to define a "low-stress setting," but instead described the necessary factors for a low-stress setting in great detail, including limitations relating to the paragraph B criteria identified as mildly or moderately limited at step three of the sequential analysis. (See Tr. at 22-24.) In light of these descriptors, the Court finds that the RFC in this case was both supported by substantial evidence and readily susceptible to judicial review.

14

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #9] is DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #13] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 21st day of March, 2024.

/s/ Joi Elizabeth Peake
United States Magistrate Judge
